IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-CV-01561-WYD-MJW

MOHAMMAD AMIN SALAMEH,

        Plaintiff,

v.

| | |
|---|---|
| MICHAEL MUKASEY, | in his official capacity as U.S. Attorney General, |
| HARLEY LAPPIN, | in his official capacity as Director, Federal Bureau of Prisons, |
| HARRELL WATTS, | in his official capacity as Administrator, National Inmate Appeals, |
| RONALD WILEY, | in his official capacity as Warden, USP Florence ADMAX, |
| DAVE JOHNSON, RIYAD KAZAN, MARTY DANIELL, DOUGH BRENNAN, ERIC ESPLUND, AND JIM MOORE, | in their official capacity as Agents, Federal Bureau of Investigation, |
| TOMMY GOMEZ, | in his official capacity as Unit Manager, USP Florence ADMAX, |
| ALOMA KIDWILER, | in her official capacity as Special Investigative Services Technician, USP Florence ADMAX, |
| FNU CASTANEDA, | in his official capacity as Captain, USP Florence ADMAX, |

        Defendants.

---

## PLAINTIFF'S PROPOSED FIRST AMENDED COMPLAINT

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §

1331 because this action arises under the Constitution and laws of the United States.

2.      This Court has authority to grant injunctive relief in this action pursuant to 5

U.S.C. § 702, 42 U.S.C. § 2000 cc-2, and Rule 65 of the Federal Rules of Civil Procedure.

3.      This Court has authority to grant mandamus relief pursuant to 28 U.S.C. § 1361,

and Rule 81(b) of the Federal Rules of Civil Procedure.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2)

because a substantial part of the events and omissions giving rise to Mr. Salameh's claims

occurred, and continues to occur, in this district.

## PARTIES

5.      Plaintiff Mohammad Amin Salameh is a prisoner in the custody of the Federal

Bureau of Prisons ("BOP").  Mr. Salameh has filed three lawsuits challenging the conditions of

his confinement or violations of his civil rights:

Salameh v. Scott
U.S. District Court, District of Kansas
3:94-cv-03392-RDR
Defendants' motion for summary judgment granted; action dismissed on the merits.

Salameh v. Carlson et al.
U.S. District Court, Central District of California
cv-98-8493-SVW (MLG)
Minute order filed: judgment for defendant Jason Swanson.

Salameh v. Herrera et al.
U.S. District Court, Central District of California
cv-02-06113-JVS (MLG)
Dismissed without prejudice.

6. Defendant Michael Mukasey is the United States Attorney General. At all relevant times, defendant Mukasey had decision-making authority over all prisoners in the custody of the BOP.

7. Defendant Harley Lappin is the Director of the BOP. At all relevant times, defendant Lappin had decision-making authority over all prisoners in the custody of the BOP, all BOP employees, and all BOP facilities.

8. Defendant Harrell Watts is the Administrator of National Inmate Appeals for the BOP Central Office. Defendant Watts issues rulings on Central Office Administrative Remedy Appeals—the final appeal under the BOP's Administrative Remedy program.

9. Defendant Ronald Wiley is the ADX Warden. At all relevant times, defendant Wiley, as Warden, exercised responsibility for the administration, operation, maintenance, policies, procedures, and functions at the ADX.

10. Defendants Dave Johnson, Riyad Kazan, Dough Brennan, Eric Esplund, and Jim Moore (collectively "defendant FBI Agents") are FBI agents assigned to handle FBI matters involving the ADX.

11. Defendant Tommy Gomez is the Unit Manager for H Unit with responsibility for the day-to-day operation of H Unit and the enforcement of Mr. Salameh's SAMs.

12. Defendant Aloma Kidwiler is a Special Investigative Services ("SIS") technician at the ADX. Defendant Kidwiler participates in the daily activities of the SIS office, including phone monitoring, mail monitoring, intelligence-gathering, and censoring Plaintiff's 30-day delayed copy of *USA Today*, the sole publication Plaintiff is permitted to read under the SAMs.

13. Defendant FNU Castaneda is the Captain at the ADX with responsibility for, and decision-making authority, over ADX security.

14.     Each defendant was acting under color of federal law and is sued in his or her official capacity.

## FACTUAL ALLEGATIONS

### I.      Introduction

15.     Plaintiff Mohammad Amin Salameh is a federal prisoner at the United States Penitentiary Administrative Maximum ("ADX") in Florence, Colorado.  Mr. Salameh was convicted in the United States District Court for the Southern District of New York on charges related to the 1993 World Trade Center bombing.  He is serving a sentence of 116 years, 11 months.

16.     New York City observed the 12th anniversary of the 1993 World Trade Center bombing with a weekend memorial service on February 26, 2005.  The anniversary was still fresh in the public mind on Monday, February 28, 2005, when MSNBC opened its evening television news show "Countdown" with a powerful sound bite.  MSNBC promised viewers the "appalling" story of how three of the men convicted in the 1993 World Trade Center bombing, including Mr. Salameh, were "somehow permitted to keep writing from jail to Arabic newspapers, [and] to other would-be terrorists, all because somebody in our Bureau of Prisons didn't think these guys were threats anymore."  The report also alleged that Mr. Salameh was "exhorting acts of terrorism and helping recruit would-be terrorists for jihad."

17.     A follow-up edition of "Countdown" aired on March 1, 2005.  MSNBC reported that while Mr. Salameh was "writing letters to other suspected terrorists and brazenly praising Osama bin Laden in Arabic newspapers," the BOP was reassuring the public that terrorists were under control.  Law enforcement officials and members of Congress were quoted as expressing outrage over the BOP's "horrible lapse."

18.     Former United States Attorney General Alberto Gonzales promised the public that he would investigate and take action.  On March 17, 2005, Gonzales requested that defendant Lappin impose Special Administrative Measures ("SAMs") on Mr. Salameh.  The SAMs are authorized by BOP regulations codified in the Code of Federal Regulations:

> "Upon direction of the Attorney General, the Director, Bureau of Prisons, may authorize the Warden to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury.  These procedures may be implemented upon written notification to the Director, Bureau of Prisons, by the Attorney General . . . that there is a substantial risk that a prisoner's communication or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."  28 C.F.R. § 501.3 (2006).

19.     Mr. Salameh was transferred out of the ADX general population into the Special Security Unit ("SSU"), commonly called "H-Unit," concurrent with the imposition of the SAMs. H-Unit is the most restrictive within the ADX—a control unit within a control unit.

## II.     Background Facts

20.     After his conviction in 1994, Mr. Salameh was housed at the United States Penitentiary in Leavenworth, Kansas ("USP Leavenworth").  In 1998, Mr. Salameh was transferred to the United States Penitentiary in Lompoc, California ("USP Lompoc").  Mr. Salameh was housed in the general population at USP Leavenworth.  Mr. Salameh was also housed in the general population at USP Lompoc—until September 11, 2001.  Mr. Salameh was transferred to administrative detention on September 11 based on the events that took place

outside the prison.  Mr. Salameh had been an active and successful participant in USP Lompoc's general population programs up to that day.

21.     On information and belief, on September 11, 2001, then-Attorney General John Ashcroft directed the BOP to remove all prisoners designated as terrorists from the general population.  On information and belief, the purpose of this action was to segregate these prisoners until they could be investigated to determine whether they had any prior knowledge of, or ties to, the events of September 11, 2001.

22.     On March 28, 2002, Ashcroft issued a memorandum ( "Ashcroft Memorandum") to all BOP Regional Directors regarding the handling of "Pre-September 11th Terrorists Inmates."  The Ashcroft Memorandum stated that certain of these prisoners were appropriate for transfer to the ADX and that most of such prisoners had, in fact, already been referred for transfer.  On information and belief, Mr. Salameh was one of those referred for transfer to the ADX.

23.     On October 4, 2002, Mr. Salameh was transferred to the ADX.  After Mr. Salameh's arrival at the ADX, and prior to the imposition of the SAMs, SIS staff reviewed Mr. Salameh's incoming and outgoing correspondence and monitored Mr. Salameh's telephone calls.

24.     Between 2002 and 2004, Mr. Salameh corresponded with certain men incarcerated in Spanish prisons.  These men, who were imprisoned for criminal charges such as drug-dealing and robbery, made the initial contact with Mr. Salameh.  Mr. Salameh's address is now, as it was in 2002, public information that is readily accessible on the BOP website.

25.     The letters Mr. Salameh exchanged with these prisoners were delivered to BOP staff for mail processing in accordance with BOP and ADX institutional policies.  Mr. Salameh did not use the letters to encourage or condone violence.

26.     On or about July 2004, ADX staff informed Mr. Salameh that he was not authorized to correspond with these men without advance approval—and Mr. Salameh immediately stopped corresponding with them.  The matter was resolved informally.  Mr. Salameh did not receive an incident report in connection with the correspondence.

27.     BOP regulations permit inmates to correspond with media representatives.  In 2002, while Mr. Salameh was housed at USP Lompoc, he sent a letter to the Editor-in-Chief of *Al-Quds Al-Arabi*, an Arabic newspaper published in London.  The letter was published in the July 5, 2002, edition of *Al-Quds Al-Arabi*.  Mr. Salameh expressed admiration for Osama bin Laden and other public figures.  Mr. Salameh's opinions, although controversial, constitute protected speech.

### III.     The Special Administrative Measures ("SAMs")

28.     In response to the pressure the MSNBC report generated in the media and in the Congress, former U.S. Attorney General Gonzales took action on March 17, 2005.  Gonzales requested that defendant Lappin immediately implement SAMs for Mr. Salameh.  The SAMs took effect immediately upon notice to Mr. Salameh and remained in effect for one year. Gonzales authorized the extension of the SAMs in March 2006 and March 2007.  Plaintiff reasonably believes that defendant Mukasey has or will authorize the extension of the SAMs in March 2008.  Mr. Salameh's current SAMs (March 2007) are attached as Exh. 1.

29.     The SAMs deprive Mr. Salameh of a significant liberty interest and violate Mr. Salameh's First, Fourth, Fifth, Sixth, and Eighth Amendment rights.  Mr. Salameh has never received notice of the factual basis for the imposition of the SAMs—and he has never been provided with a hearing or fair opportunity for rebuttal.

30.     Prisoners at the ADX are housed in solitary confinement for approximately 23 per day under highly restrictive conditions characterized by social isolation and sensory deprivation. Nonetheless, non-SAMs prisoners at the ADX are permitted to communicate with the outside world, pursuant to BOP and ADX regulations—and disciplinary actions follow procedures set forth in BOP regulations.

31.     The SAMs are an atypical and significant hardship on Mr. Salameh in relation to the incidents of ordinary ADX life because the SAMs severely restrict or eliminate what was left of Mr. Salameh's contact—social, intellectual, religious, psychological, and legal—with the world outside of his cell.  Furthermore, defendants go unreasonably exceed the plain meaning of the SAMs in their day-to-day application and enforcement of the SAMS.

32.     The SAMs prohibit Mr. Salameh from communicating with other inmates.

33.     The SAMs limit Mr. Salameh's communication with his family to his immediate family, i.e., his parents and his brothers and sisters.  Communication includes mail, telephone calls, and the receipt of funds.  (In late 2007, Mr. Salameh received approval to communicate with his brother-in-law.)  As a result, Mr. Salameh's relationship with his family in Jordan has suffered a great harm.

34.     Under the SAMs, all of Mr. Salameh's mail to and from his immediate family must be routed through defendant FBI Agents for translation and analysis.  This results in delays of three months or more for non-English mail, and delays of one to two months for English mail. A letter containing a nothing more than a single photograph of Mr. Salameh was delayed for 15 weeks.  It takes Mr. Salameh almost six months to exchange one letter in Arabic with his mother and father in Jordan.  In addition to the excessive delays, the SAMs unreasonably limit the

volume and frequency of Mr. Salameh's correspondence with his immediate family by limiting Mr. Salameh to 3 sheets of 8.5" x 11" paper (double-sided) per calendar week.

35.     The SAMs unreasonably and unnecessarily cut Mr. Salameh off from his extended family in Jordan and in the U.S.  He is not permitted to communicate by mail or telephone with his young nieces and nephews, his aunts and uncles, or other extended family members.  Nor is Mr. Salameh permitted to receive funds from these family members.

36.     Defendant FBI Agents control all of Mr. Salameh's contact and communications with the outside world including all visitors, visits, communications, correspondence, telephone number approvals, subscriptions to periodicals, and orders for religious and educational publication.  Defendant FBI Agents routinely subject Mr. Salameh's requests for approval to excessive delays or outright rejection.

37.     Defendant FBI Agents have denied Mr. Salameh access to all of the secular and religious newspapers and magazines he formerly subscribed to.  Since the imposition of the SAMs, Mr. Salameh has submitted numerous requests for new subscriptions—or a list of acceptable publications—to defendant Kidwiler.  According to defendant Kidwiler, virtually all of Mr. Salameh's requests have been denied by defendant FBI Agents.

38.     Mr. Salameh cannot appeal defendant FBI Agents' decisions to higher FBI authority, nor can he appeal their decisions through the BOP's Administrative Remedy program. According to defendant Watts, the BOP does not have the authority to override defendant FBI Agents' decisions in this regard.

39.     Since the imposition of the SAMs, Mr. Salameh's religious and educational book orders are rejected or subject to excessive and unreasonable delay before being released to Mr.

Salameh.  Defendant FBI Agents and defendant Kidwiler delay or deny access to publications that have already been approved for other SAMs inmates.

40.     Under the SAMs, Mr. Salameh's only authorized publication is *USA Today*.  Mr. Salameh is not permitted to receive the publication until the issue is 30 days old and has been censored by defendant Kidwiler.  Defendant Kidwiler uses her discretion to censor each issue by cutting out individual articles or removing entire sections.

41.     Under the SAMs, Mr. Salameh is denied access to television stations that "primarily broadcast news."  Defendants enforce this provision of the SAMs by denying Mr. Salameh access to virtually all of the major television networks, local networks, and entertainment channels such as "PBS" under the pretext that those networks "primarily" broadcast news.

42.     Under the SAMs, Mr. Salameh is not permitted to communicate with lawyers who have not submitted to and passed a background check by the FBI and signed a SAMs "affirmation" document.  Mr. Salameh cannot initiate contact with attorneys or legal clinics to seek legal representation, even though BOP regulations state that the Warden shall permit prisoners to contact and retain attorneys.

43.     Under the SAMs, there is only one category of legal mail: Mail that is clearly and properly addressed to or from Mr. Salameh's SAMs authorized attorney.  As a result, Mr. Salameh's incoming and outgoing mail to federal and state courts, judges, U.S. Attorney's Offices, members of Congress, the BOP, federal law enforcement agencies, and "verified consular representatives" is classified as non-legal mail that must be routed through defendant FBI Agents for analysis and approval.  With respect to this category of mail, the SAMs allow a delay of up to 14 business days for English mail and 60 business days for non-English mail.

This provision of the SAMs allows defendant Kidwiler and defendant FBI Agents to unreasonably delay or reject, and/or read legal documents and other confidential correspondence that is classified as "Special Mail" (legal mail) under BOP regulations.

44.     The SAMs prohibit Mr. Salameh from communicating with the media—either directly or through his attorney.  This is a blanket prohibition of all contact by any means.

45.     The SAMs prohibit Mr. Salameh, who is Muslim, from participating in group prayer—including the Friday "Jumu'ah" prayer that must be performed in congregation.  Mr. Salameh receives only sporadic counseling from an Islamic representative since the imposition of the SAMs.  Mr. Salameh is not allowed to read and/or possess primary Islamic religious texts in Arabic.

46.     The SAMs have caused Mr. Salameh to suffer severe psychological distress. After the SAMs were imposed in 2005, Mr. Salameh stopped eating for 89 consecutive days.  In 2006, Mr. Salameh stopped eating for 72 consecutive days and approximately 20 nonconsecutive days.  During this time period, Mr. Salameh was subjected to more than one hundred force-feedings via naso-gastric tube.  Mr. Salameh's health deteriorated to the point that he spent more than 3 months at the Federal Medical Center in Center in Butner, North Carolina.

47.     Between October 22, 2007, and January 12, 2008, Mr. Salameh stopped eating for 82 consecutive days.  During this time period, Mr. Salameh was subjected to more than 20 force-feedings via naso-gastric tube.  Some of these force-feedings lasted 4 hours.

48.     Mr. Salameh filed a final administrative appeal in connection with the 2005 SAMs on or about July 15, 2005; defendant Watts denied Mr. Salameh's appeal on or about September 20, 2005.  See Exh. 2.

49.     Mr. Salameh filed a final administrative appeal in connection with the 2006 SAMs on or about January 17, 2007; defendant Watts denied Mr. Salameh's appeal on or about March 27, 2007.  See Exh. 3.  Defendant Watts informed Mr. Salameh that "the Bureau of Prisons neither imposes nor rescinds SAMs, but only implements the restrictions contained within.  The restrictions . . . will remain in effect until the AG determines otherwise."  Id.

50.     Mr. Salameh filed a final administrative appeal in connection with the 2007 SAMs on or about June 13, 2007; defendant Watts denied Mr. Salameh's appeal on October 2, 2007.  See Exh. 4.

IV.     The Special Security Unit ("H-Unit")

A.     H-Unit Conditions

51.     BOP regulations set standards for basic living conditions—the minimal civilized measure of basic necessities—for inmates who are confined in disciplinary and administrative segregation.  Defendants Lappin, Watts, Wiley, and Gomez fail to implement, enforce, and follow those standards in H-Unit with respect to physical exercise, personal hygiene, cell sanitation, and nutritionally adequate meals.

B.     Physical Exercise

52.     Mr. Salameh is deprived of the regular opportunities for out of cell physical exercise—and minimum hours per week—mandated by BOP regulations: "Staff shall permit each segregated inmate no less than five hours *exercise* each week."  28 C.F.R. § 541.21(c)(6) (Emphasis added).  Furthermore, the regulations state that "[t]hese provisions must be carried out unless compelling security or safety reasons dictate otherwise."  Id.  The baseline five hours also applies to inmates in administrative segregation; according to the regulations, weekly physical

exercise for inmates in administrative segregation "will meet the level established for disciplinary segregation and exceed this level where resources are available." Id. at § 541.22(d).

53.     There are two types of recreation for H-Unit inmates: "Outside Cages" and "Inside Recreation." "Inside Recreation" offers nothing in the way of exercise—just a change of scenery. Mr. Salameh is escorted to a small, *empty* room with a low ceiling and inadequate ventilation and climate control. No exercise equipment, not even a pull-up bar, is provided. On information and belief, H-Unit staff members are used to take other units to their scheduled recreations or to perform duties in other units. As a result, H-Unit recreation is cancelled. According to ADX policy, H-Unit's cancelled recreation periods are *not* subject to make-up. See Exh. 5.

54.     Mr. Salameh filed a final administrative appeal in connection with H-Unit recreation policies on or about March 9, 2006. Defendant Watts denied Mr. Salameh's appeal on or about April 25, 2006. See Exh. 6.

C.     Personal Hygiene and Cell Sanitation

55.     H-Unit lacks a regular schedule for trash collections and for the distribution of articles necessary for personal hygiene such as razors and nail clippers ("sharps"). See Exh. 7. The other eight ADX units do have regular schedules. Id.

56.     Under 28 C.F.R. § 541.21(c)(5), inmates in disciplinary segregation "shall have the opportunity to shower and shave at least three times a week unless these procedures would present an undue security hazard."

57.     Mr. Salameh's records indicate that he had five opportunities to shave in April 2007, six opportunities to shave in May 2007, seven opportunities to shave in June 2007, and six opportunities to shave in July 2007.

58.     Mr. Salameh's records indicate that he had eleven opportunities to shower in April 2007, thirteen opportunities to shower in May 2007, ten opportunities to shower in June 2007, and eleven opportunities to shower in July 2007.

59.     BOP regulations mandate that quarters used for disciplinary segregation be maintained in "sanitary condition" at all times.  Id. § 541.21(c)(1).  A basic element of sanitation is trash removal.  Because H-Unit does not have a regular schedule, trash collection takes place only once a week, despite the fact that ADX staff maintain that trash is collected three times a week.

60.     Mr. Salameh filed a final administrative appeal in connection with H-Unit sanitation policies on or about August 25, 2005.  Defendant Watts denied Mr. Salameh's appeal on or about November 10, 2005.  See Exh. 8.

61.     Mr. Salameh filed a final administrative appeal in connection with H-Unit personal hygiene and cell sanitation policies on or about October 12, 2005.  Defendant Watts denied Mr. Salameh's appeal on or about December 20, 2005.  See Exh. 9.

D.     X-raying Meal Trays and Commissary Items

62.     Inmates in disciplinary segregation must be provided with nutritionally adequate meals.  Id. at § 541.21(c)(4).  ADX and H-Unit procedures significantly increase Mr. Salameh's daily exposure to radiation thereby depriving Mr. Salameh of a nutritionally adequate diet.

63.     On information and belief, ADX staff use X-ray machines to scan commissary items for contraband when the items are delivered to the ADX.  All of H-Unit's meal trays and commissary items are passed through an X-ray machine prior to distribution.  Everything Mr. Salameh eats has been exposed at least once—and possibly twice—to an unknown amount of radiation pursuant to the policies and procedures in effect for the ADX and H-Unit.

64.     On information and belief, only H-Unit prisoners' meal trays are passed through the X-ray machine prior to distribution.

65.     In response to Mr. Salameh's attempt to resolve the problem at the institutional level, ADX staff provided Mr. Salameh with information on the safety of food irradiation from the U.S. Food and Drug Administration ("FDA") website.  Mr. Salameh filed a final administrative remedy request in connection with the x-raying of his meal trays and commissary items on or about July 13, 2006.  On or about September 26, 2006, defendant Watts denied Mr. Salameh's appeal, stating that "issue has been exhaustively studied by the U.S. Food and Drug Administration," and that "there is no evidence of harmful effect."  See Exh. 10.

66.     While there is a consensus in the scientific community as to the amount of research that has been conducted on food irradiation, there is no consensus on the potential health risks.  Researchers have noted adverse health effects in animals, including but not limited to nutritional deficiencies and stunted growth, organ damage, blood disorders, tumors, and premature death.  Studies have also demonstrated that irradiation at high does can reduce vitamins and essential nutrients.  Regulatory limitations preclude large-scale testing on human beings.  However, according to the World Health Organization ("WHO"), there are just a few "special niches" of approved use of diets based entirely on irradiated foods.  Approval in the United States is limited to immuno-compromised hospital patients and astronauts.

67.      In sum, defendants have a ministerial duty to provide Mr. Salameh with minimum amounts of weekly physical exercise, and minimum weekly opportunities to maintain personal hygiene and cell sanitation as mandated by the BOP regulations governing administrative and disciplinary segregation.

E.      Excessive Night Noise

68.     Mr. Salameh's sleep is consistently disrupted at night, causing him to suffer from frequent headaches and depression, because correctional officers working in H-Unit intentionally or negligently cause unbearable noise when opening and closing H-Unit's 5 grilles and 3 gates grilles during the night.  Correctional officers in H-Unit also buff the floors during the night when H-Unit prisoners, including Mr. Salameh, are trying to sleep.  These policies and procedures amount to a form of sleep deprivation.

69.     On information and belief, excessive night noise as described herein is not a problem in other units at the ADX.

70.     Mr. Salameh suggested that the addition of certain buffering materials to the gates and grilles would absorb some of the impact and thereby reduce the excessive night noise. Defendant Watts informed Mr. Salameh that such modifications would interfere with the secure and orderly running of the institution.  See Exh. 11.

71.     Mr. Salameh filed a final administrative remedy request in connection with excessive night noise on or about October 2, 2007.  On or about November 29, 2007, defendant Watts denied Mr. Salameh's appeal.  Id.

### FIRST CLAIM FOR RELIEF

### Fifth Amendment to the U.S. Constitution

(Defendants Mukasey, Lappin, Watts, Wiley, FBI Agents, Gomez, and Kidwiler)

72.     Mr. Salameh re-alleges and incorporates by reference paragraphs 1-71 herein.

73.     Defendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs constitute an atypical and significant hardship on Mr. Salameh in relation to the ordinary incidents of ADX life.

74. Defendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs have deprived Mr. Salameh of a significant liberty interest without affording Mr. Salameh any procedural protections.

75. Defendants' above-mentioned policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs deprive Mr. Salameh of the equal protection of the law compared to fellow non-SAMs prisoners at the ADX.

76. As a proximate result of defendants' unconstitutional policies, practices, acts, and omissions, Mr. Salameh has been, and continues to be, deprived of the procedural due process and equal protection rights guaranteed by the Fifth Amendment to the U.S. Constitution. Mr. Salameh is suffering, and will continue to suffer, immediate and irreparable injury. Mr. Salameh has no plain, adequate, or complete remedy at law to address the wrongs described herein. The equitable relief sought is necessary to prevent continued and further deprivations of Mr. Salameh's rights under the Fifth Amendment.

## SECOND CLAIM FOR RELIEF

### First and Fifth Amendments to the U.S. Constitution

(Defendants Mukasey, Lappin, Watts, Wiley, FBI Agents, Gomez, and Kidwiler)

77. Mr. Salameh re-alleges and incorporates by reference paragraphs 1-76 herein.

78. Defendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs deprive Mr. Salameh of freedom of speech, freedom of expression, freedom of association, and the right to receive information consistent with his status as a prisoner, and deprive Mr. Salameh of the equal protection of the law compared to fellow non-SAMs prisoners at the ADX.

79.     Defendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs resulted from the political pressure generated by the MSNBC broadcasts.

80.     Defendants' policies, practices, acts, and omissions are designed to punish Mr. Salameh for the opinions he expressed in his letter to Editor of *Al-Quds Al-Arabi*.

81.     Defendants' policies, practices, acts, and omissions leave Mr. Salameh without alternative means of exercising the full range of First Amendment rights consistent with his status as a prisoner, and deprive Mr. Salameh of the equal protection of the law compared to fellow non-SAMs prisoners at the ADX.

82.     As a proximate result of defendants' unconstitutional policies, practices, acts, and omissions, Mr. Salameh has been deprived of freedom of speech and association rights guaranteed by the First and Fifth Amendments to the U.S. Constitution.  Mr. Salameh is suffering, and will continue to suffer, immediate and irreparable injury.  Mr. Salameh has no plain, adequate, or complete remedy at law to address the wrongs described herein.  The equitable relief sought is necessary to prevent continued and further deprivations of Mr. Salameh's rights under the First, and Fifth Amendments to the United States Constitution.

THIRD CLAIM FOR RELIEF

First, Fifth, and Sixth Amendments to the U.S. Constitution

(Defendants Mukasey, Lappin, Watts, Wiley, FBI Agents, Gomez, and Kidwiler)

83.     Mr. Salameh re-alleges and incorporates by reference paragraphs 1-82 herein.

84.     Defendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs eviscerate Mr. Salameh's right to consult with and/or retain attorneys or law clinics by prohibiting Mr. Salameh from communicating with

attorneys who have not already signed a SAMs affirmation, and deprive Mr. Salameh of the equal protection of the law as compared to fellow non-SAMs prisoners at the ADX.

85.     As a proximate result of defendants' unconstitutional policies, practices, acts, and omissions, Mr. Salameh has been deprived of the rights of association, petition, and free speech guaranteed by the First Amendment, the right to the equal protection of the law guaranteed by the Fifth Amendment, and the right to counsel guaranteed by the Sixth Amendment.  Mr. Salameh is suffering, and will continue to suffer, immediate and irreparable injury.  Mr. Salameh has no plain, adequate, or complete remedy at law to address the wrongs described herein.  The equitable relief sought is necessary to prevent continued and further deprivations of Mr. Salameh's rights under the First, Fifth, and Sixth Amendments to the U. S. Constitution.

FOURTH CLAIM FOR RELIEF

First, Fourth, and Fifth Amendments to the U.S. Constitution

(Defendants Mukasey, Lappin, Watts, Wiley, FBI Agents, Gomez, and Kidwiler)

86.     Mr. Salameh re-alleges and incorporates by reference paragraphs 1-85 herein.

87.     Defendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs deprive Mr. Salameh of right to communicate confidentially with attorneys, the U.S. courts, federal judges, the U.S. Attorney's Office, members of the U.S. Congress, the BOP, federal law enforcement entities, and verified consular officials—by classifying Mr. Salameh's incoming and outgoing mail to these persons as nonlegal mail that must be forwarded to the FBI for analysis and approval before delivery, and deprive Mr. Salameh of the equal protection of the law compared to fellow non-SAMs prisoners at the ADX.

88.     As a proximate result of defendants' unconstitutional policies, practices, acts, and omissions, Mr. Salameh has been deprived of his First Amendment rights of association, petition, and free speech, his Fourth Amendment rights to be free from unreasonable search and seizure, and his Fifth Amendment right to the equal protection of the law.

89.     Mr. Salameh is suffering, and will continue to suffer, immediate and irreparable injury.  Mr. Salameh has no plain, adequate, or complete remedy at law to address the wrongs described herein.  The equitable relief sought is necessary to prevent continued and further deprivations of Mr. Salameh's rights under the First, Fourth, and Fifth Amendments to the U. S. Constitution.

<u>FIFTH CLAIM FOR RELIEF</u>

<u>First and Fifth Amendments to the U.S. Constitution and RLUIPA</u>

(Defendants Mukasey, Lappin, Watts, Wiley, FBI Agents, Gomez, and Kidwiler)

90.     Mr. Salameh re-alleges and incorporates by reference paragraphs 1-89 herein.

91.     Defendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs deprive Mr. Salameh of the free exercise of his religion and the equal protection of the law as compared to fellow non-SAMs prisoners at the ADX.

92.     Defendants' policies, practices, acts, and omissions in connection with the imposition, extension, and enforcement of the SAMs substantially burden Mr. Salameh's religious exercise by prohibiting group prayer, prohibiting Mr. Salameh from communicating with fellow ADX prisoners, prohibiting Mr. Salameh from access to primary Islamic religious texts, and denying Mr. Salameh reasonable access to counseling by an Islamic representative.

93.     Defendants' policies, practices, acts, and omissions are an unreasonable and exaggerated response to any legitimate governmental objective and deprive Mr. Salameh of alternative forms of religious exercise.

94.     As a proximate result of defendants' unconstitutional policies, practices, acts, and omissions, Mr. Salameh is suffering, and will continue to suffer, immediate and irreparable injury.  Mr. Salameh has no plain, adequate, or complete remedy at law to address the wrongs described herein.  The equitable relief sought is necessary to prevent continued and further deprivations of Mr. Salameh's rights under the First and Fifth Amendments to the U.S. Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA").

<u>SIXTH CLAIM FOR RELIEF</u>

<u>Fifth and Eighth Amendments to the U.S. Constitution and APA</u>

(Defendants Lappin, Watts, Wiley, and Gomez)

95.     Mr. Salameh re-alleges and incorporates by reference paragraphs 1-94 herein.

96.     Defendant Lappin has the ministerial duty of safekeeping, care, and subsistence of all prisoners in the custody of the BOP.  Defendant Watts has a duty to resolve inmates' Central Office Administrative Remedy Appeals fairly and in accordance with BOP regulations. Defendant Wiley has the ministerial duty of safekeeping, care, and subsistence of ADX inmates. Defendant Gomez has the ministerial duty of managing the day-to-day operations of H Unit in accordance with BOP regulations.

97.     The defendants' failure to fulfill their ministerial duty to Mr. Salameh endangers Mr. Salameh's health and offends contemporary standards of decency in violation of the Eighth Amendment.

98. Defendants' ministerial duties include providing ADX inmates with the minimum amounts of physical exercise, personal hygiene supplies, and cell sanitation mandated by BOP regulations.

99. The defendants' policies, practices, acts, and omissions deprive Mr. Salameh of the minimum of five hours of physical exercise per week mandated by BOP regulations for inmates in disciplinary or administrative segregation, and deprive Mr. Salameh of the equal protection of the law as compared to fellow prisoners housed in other units at the ADX.

100. The defendants' policies, practices, acts, and omissions deprive Mr. Salameh of the minimum levels of personal hygiene and cell sanitation mandated by BOP regulations for inmates in disciplinary or administrative segregation, and deprive Mr. Salameh of the equal protection of the law as compared to fellow prisoners housed in other units at the ADX.

101. As a proximate result of the defendants' failure to fulfill their ministerial duty, Mr. Salameh is suffering, and will continue to suffer, immediate and irreparable injury. Mr. Salameh has no plain, adequate, or complete remedy at law to address the wrongs described herein. The equitable relief sought by Mr. Salameh is necessary to prevent continued and further deprivations of Mr. Salameh's rights under the Fifth and Eighth Amendments to the United States Constitution and the Administrative Procedures Act ("APA").

<u>SEVENTH CLAIM FOR RELIEF</u>

<u>Fifth and Eighth Amendments to the U.S. Constitution and APA</u>

(Defendants Lappin, Watts, Wiley, Castaneda, and Gomez)

102. Mr. Salameh re-alleges and incorporates by reference paragraphs 1-101 herein.

103. Defendant Lappin has the ministerial duty of safekeeping, care, and subsistence of all prisoners in the custody of the BOP. Defendant Watts has a duty to resolve inmates' Central

Office Administrative Remedy Appeals fairly and in accordance with BOP regulations. Defendant Wiley has the ministerial duty of safekeeping, care, and subsistence of ADX inmates. Defendant Castaneda has the ministerial duty of managing ADX and H-Unit security operations in accordance with BOP regulations. Defendant Gomez has the ministerial duty of managing the day-to-day operations of H Unit in accordance with BOP regulations.

104.    Defendants' ministerial duties include providing ADX inmates with nutritionally adequate meals mandated by BOP regulations.

105.    The policies, practices, and acts of defendants in connection with the x-raying of all of Mr. Salameh's meal trays and commissary items unreasonably increases Mr. Salameh's daily exposure to potentially carcinogenic radiation, endangers Mr. Salameh's health, and offends contemporary standards of decency in violation of the Eighth Amendment. Such policies, practices, and acts also deprive Mr. Salameh of the equal protection of the law compared to fellow prisoners housed in other units at the ADX.

106.    Defendants are aware of—and deliberately indifferent to—the unreasonable and significant risk that providing Mr. Salameh with a diet based entirely on irradiated food will cause Mr. Salameh to develop serious, irreversible health problems.

107.    As a proximate result of defendants' policies, practices, acts, and omissions, Mr. Salameh is suffering, and will continue to suffer, immediate and irreparable injury. Mr. Salameh has no plain, adequate, or complete remedy at law to address the wrongs described herein. The equitable relief sought is necessary to prevent continued and further deprivations of Mr. Salameh's rights under the Fifth and Eighth Amendments to the United States Constitution and the APA.

EIGHTH CLAIM FOR RELIEF

<u>Fifth and Eighth Amendments to the U.S. Constitution and APA</u>

(Defendants Lappin, Watts, Wiley, and Gomez)

108.    Mr. Salameh re-alleges and incorporates by reference paragraphs 1-107 herein.

109.    Defendant Lappin has the ministerial duty of safekeeping, care, and subsistence of all prisoners in the custody of the BOP. Defendant Watts has a duty to resolve inmates' Central Office Administrative Remedy Appeals fairly and in accordance with BOP regulations. Defendant Wiley has the ministerial duty of safekeeping, care, and subsistence of ADX inmates. Defendant Gomez has the ministerial duty of managing the day-to-day operations of H Unit in accordance with BOP regulations.

110.    Defendants' ministerial duties include providing Mr. Salameh with conditions of confinement that do not unreasonably endanger his physical and mental health. Defendants are aware of—and deliberately indifferent to—the unreasonable and significant risk that sleep deprivation will cause Mr. Salameh significant and potentially irreversible health problems.

111.    The policies, practices, and acts of defendants in connection with the excessive night noise offend contemporary standards of decency and deprive Mr. Salameh of the equal protection of the law as compared to fellow prisoners in other units at the ADX.

112.    As a proximate result of defendants' policies, practices, acts, and omissions, Mr. Salameh is suffering, and will continue to suffer, immediate and irreparable injury. Mr. Salameh has no plain, adequate, or complete remedy at law to address the wrongs described herein. The equitable relief sought is necessary to prevent continued and further deprivations of Mr. Salameh's rights under the Fifth and Eighth Amendments to the United States Constitution and the APA.

PRAYER FOR RELIEF

WHEREFORE, Mr. Salameh respectfully requests that the Court:

    a.  Permanently enjoin defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Mr. Salameh to the unconstitutional acts, omissions, policies, and conditions described herein in Claims One, Two, Three, Four, Five, Six, and Seven.

    b.  Issue injunctive relief narrowly tailored to rectify the conditions and deprivations in Claims One, Two, Three, Four, Five, Six, Seven, and Eight.

    c.  Order defendants Lappin, Watts, Wiley, and Gomez to fulfill the ministerial duties owed to Mr. Salameh by establishing and maintaining the regular schedules for exercise, personal hygience, and cell sanitation required by BOP regulations in order to rectify the conditions and deprivations in Claim Six.

    d.  Order defendants Lappin, Watts, Wiley, Castaneda, and Gomez to fulfill the ministerial duties owed to Mr. Salameh by providing Mr. Salameh with safe, nutritionally adequate meals to rectify the conditions and deprivations in Claim Seven.

    e.  Order defendants Lappin, Watts, Wiley, and Gomez to fulfill the ministerial duties owed to Mr. Salameh by rectifying the conditions and deprivations in Claim Eight.

    f.  Grant Mr. Salameh costs and attorney fees pursuant to 42 U.S.C. § 1988 and other applicable law; and,

Grant such other and further relief as this Court deems just and proper.

DATED:  February 25, 2008

s/*Joyce Ellen Rosendahl*
Joyce Ellen Rosendahl

California State Bar #242807
Law Offices of Joyce Ellen Rosendahl
P.O. Box 15966
Newport Beach, CA  92659
Phone: 949-922-9462
Fax: 949-480-0062
Email: joycerosendahl@rosendahl-law.com
Attorney for Plaintiff Mohammad Amin Salameh

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 25th day of February, 2008, I electronically filed the foregoing PLAINTIFF'S PROPOSED FIRST AMENDED COMPLAINT, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email address of William Pharo, Assistant United States Attorney:

william.pharo@usdoj.gov

<u>s/ Joyce Ellen Rosendahl</u>
Joyce Ellen Rosendahl
Law Offices of Joyce Ellen Rosendahl
P.O. Box 15966
Newport Beach, CA  92659
Phone: 949-922-9462
Fax: 949-480-0062
joycerosendahl@rosendahl-law.com
Attorney for Plaintiff