# Exhibit A-1
## Defendants' Motion for Summary Judgment

*Salameh v. Mukasey, et al.*
Civil Action No. 07-cv-01561-WYD-MJW

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-01561-WYD-MJW

MOHAMMAD AMIN SALAMEH,

    Plaintiff,

v.

MICHAEL MUKASEY, et al.,

    Defendants.

---

## DECLARATION OF CHRISTOPHER B. SYNSVOLL

---

I, Christopher B. Synsvoll, pursuant to 28 U.S.C. §1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above entitled matter:

    1.    I am the Supervisory Attorney at the United States Department of Justice ("DOJ"), Federal Bureau of Prisons ("Bureau") facilities known as the Federal Correctional Complex ("FCC"), Florence, Colorado. I have been so employed since July 2002. I have been employed by the Bureau, in positions of increasing responsibility, since September 1998.

    2.    The FCC Florence consists of a minimum security Federal Prison Camp ("FPC"), a medium security Federal Correctional Institution ("FCI"), the United States Penitentiary-High Security ("USP"), and the United States Penitentiary-Administrative

Maximum ("ADX"). The legal department is located in the Administrative Building of the ADX.

3. As the Supervisory Attorney for the legal department at the FCC Florence, I am familiar with all four levels of the inmate administrative grievance procedure created by the Bureau Administrative Remedy Program. *See* 28 C.F.R. §§ 542.10 - 542.19. Inmates who are subject to Special Administrative Measures, or SAM, may use the Administrative Remedy Program to challenge any aspects of their SAM, including the imposition of the SAM and renewals of the SAM. Id. § 501.3(e). These inmates may also use the Administrative Remedy Program to request modifications to their respective SAM and challenge the decision to deny a requested modification. Id.

4. There are currently forty-three (43) inmates in the custody of the Bureau with SAM. Thirty-one (31) of those 43 inmates are incarcerated at the ADX in the H Unit. The plaintiff, Mohammad Amin Salameh, Federal Register Number 34338-054, is currently incarcerated at the ADX with SAM in the H Unit.

5. Seeking to lift the SAM, or a specific restriction in the SAM, through the administrative remedy process is not futile. The Administrative Remedy Program provides a structure to allow an inmate with SAM to obtain a comprehensive review of the SAM by facilitating the transmittal of information among all entities involved in the SAM process—including the Federal Bureau of Investigation (FBI), the Bureau and DOJ personnel—in order to arrive at an informed decision about an inmate's issues and/or requests concerning his SAM. The Administrative Remedy Program provides a

mechanism for the inmate to request and obtain modifications to his SAM, including the complete removal and/or non-renewal of SAM.

6. As Supervisory Attorney, I am involved in preparing responses and reviewing responses to inmates' requests for administrative relief concerning SAM, including those filed by the plaintiff. I provide legal advice to staff at the ADX in connection with these requests for administrative relief. I continue to assist with the review of these requests if they proceed beyond the institutional level by providing information and following-up with FBI and other DOJ personnel concerning an issue.

7. In reviewing/preparing a response to an issue raised concerning SAM, I interact with FBI, Bureau, and other DOJ personnel outside the ADX to transmit information about the request. When ADX takes a position on a particular request, I convey that position and any supportive information to others (i.e., FBI, Bureau, and other DOJ personnel) involved in the decision making process.

8. When SAM are imposed on an inmate, SAM can immediately be challenged through the Administrative Remedy Program. At the first stage of the process, the inmate attempts informal resolution of his complaint with the appropriate Bureau staff member. 28 C.F.R. § 542.13.

9. If the grievance is not resolved informally, the inmate may file an Administrative Remedy Request (a "Form BP-9") within 20 days of the event giving rise to the grievance. Id. § 542.14. If an inmate is dissatisfied with the outcome at Step 2, he may file an appeal (a "Form BP-10") to the Regional Director within 20 days. Id. §

542.15(a). If the Step 3 appeal is unsuccessful, the inmate may file another appeal (a "Form BP-11") to the Bureau's National Inmate Appeals Coordinator within 30 days. Id. § 542.15(a). The appeal to the National Inmate Appeals Coordinator is the final stage of the administrative remedy process.

10. As of December 23, 2008, Plaintiff has accessed the administrative remedy process 367 times.

11. While an inmate with SAM is pursuing each step of the administrative remedy process, a parallel component of the process is proceeding to insure that input is received from all parties involved in initiation and implementation of the SAM. At the BP-9 stage, this office reviews the inmate's request for administrative remedy. We immediately notify the Southern Colorado Joint Terrorism Task Force ("JTTF"), which manages SAM for most of the ADX inmates, or the appropriate FBI field office, that the imposition of the SAM has been challenged. We provide the JTTF the information the inmate submitted in connection with the challenge to the imposition of the SAM.

12. At the same time, when appropriate, we notify Bureau staff in the Bureau's Central Office, or headquarters, located in Washington, D.C. Staff in the Central Office, when appropriate, contact the Office of Enforcement Operations (OEO) and/or the United States Attorney's Office (USAO) that recommended the SAM be imposed. Information may be obtained from the JTTF, FBI Field Office, and/or FBI Headquarters, concerning the imposition of the SAM and their position on the inmate's challenge. Through these multiple efforts, the Bureau collects information from all the entities that provided input

4

on the decision to impose SAM.

13. The plaintiff's conduct placed him in that rare category of individuals where SAM were deemed to be necessary to restrict his communications. When the plaintiff challenged the imposition of his SAM, the administrative record before the Bureau included information that an inmate, who had been convicted of terrorism-related crimes, had demonstrated his ability and his inclination to communicate with Mohammed Achraf and other members of a terrorist cell from the confines of the ADX. Under those circumstances, a need for the SAM was identified, and the SAM could not be lifted before they had a chance to be effective.

14. In assessing the plaintiff's challenge to the imposition of the SAM, the Bureau did not receive any information from the FBI or USAO indicating that the SAM were inappropriately imposed, including the information the plaintiff provided. The plaintiff used his written administrative remedy requests to claim that his constitutional rights had been violated and to point out that neither the Bureau or FBI had previously attempted to stop his outgoing communications from the ADX. The implication of the plaintiff's comments was that, because he had not been caught before, the SAM could not be imposed after his correspondents were identified as members of a terrorist cell.

15. The plaintiff's administrative remedy requests were reviewed, but contained nothing of substance indicating the SAM was not justified. The plaintiff provided no information to explain how he came to be in communication with members of a Spanish terrorist cell. The plaintiff was aware that the SAM were related to those

5

communications because he specifically mentioned a news report about his contact with Spanish terrorists in his administrative remedy documents, and the Bureau had placed him on restricted general correspondence approximately 8 days before the SAM were imposed. However, the plaintiff's administrative remedy requests contain no information to assuage concerns about a convicted terrorist's communications with like-minded persons in a foreign country.

16. Even if the administrative remedy process had occurred prior to the imposition of the SAM, the decision to impose the SAM would not have been different. In his later request to lift the SAM, Plaintiff provided little substance, and the information he provided would not have affected the conclusion that the plaintiff's communications should be restricted.

17. Inmates with SAM have used the administrative remedy process to achieve modifications to their respective SAM. For example, the following provisions have been modified at the requests of inmates with SAM:

    a. Permitting non-legal communication with individuals not initially authorized;

    b. Modifying the mass communications provisions by expanding the pool of permitted publications and television stations; and

    c. Removing certain delays in the receipt of newspapers and periodicals.

18. Further, there have been instances when SAMs were vacated and/or not

renewed in their entirety.

19. When an inmate utilizes the Administrative Remedy Program to attempt to modify the SAM, the process operates in much the same way as for evaluating challenges to the imposition of SAM. While the administrative remedy process is moving forward, we make independent efforts to obtain additional information that could facilitate a quicker implementation of the modification.

20. When we receive an inmate request regarding a SAM restriction, we proceed to collect information that might assist the FBI and USAO in evaluating the request. In cases where the inmate has requested the opportunity to communicate with persons not approved in the SAM, we obtain the necessary information (such as address, telephone number and any other identifying information) from the inmate. We also may work with the Special Investigative Services ("SIS") department at the ADX to evaluate whether communications with the proposed correspondent may be dangerous. With SIS's assistance, we can determine whether the inmate had corresponded with the proposed contact prior to the imposition of the SAM and whether any of the prior correspondence was determined unsuitable for the inmate to receive. The staff in SIS review the inmate's Pre-Sentence Investigation Report to check whether the individuals the inmate wants to add to the SAM communications may be prohibited or may have some connection with terrorists or terrorist organizations.

21. In most cases, the practical impact of the independent fact finding undertaken by us is to assist the inmate in establishing the factual basis to support the

request for modification. The Bureau encourages non-legal communication that is directed to socially useful goals. An inmate corresponding with members of his family maintains the morale of the inmate and develops a closer relationship between the inmate and family. Every effort is made to obtain an appropriate modification that strikes the necessary balance between ensuring maximum use of the tools available to us to identify potential threats to institutions, the public, and/or national security with maintaining the inmate's morale through development of closer relationships with members of his family.

22. Following the information gathering process, the legal department forwards the modification request to the JTTF or respective FBI field office. If the Bureau identifies a potential concern, we notify the FBI. If the Bureau supports the request, we notify the FBI. Notification is provided to the inmate by the inmate's Unit Team that the request has been forwarded for review and consideration.

23. In evaluating the request, the FBI may request additional information from the Bureau, other law enforcement entities, and the inmate, such as recent addresses, passport identification, or social security numbers. The FBI provides information concerning the request to the USAO involved in the imposition of the SAM. At the end of its internal process, the FBI advises the Bureau of their recommendation regarding the modification request. The USAO, in turn, notifies OEO.

24. If the FBI recommends that the modification be rejected, the Bureau may ask the FBI to provide information that can be passed back to the inmate as to why the request was rejected. With knowledge of the government's concerns in hand, the inmate

can more effectively present his request at the next levels of the administrative remedy process.

25. If the Bureau disagrees with the FBI's rationale to recommend a denial of a modification request, the Bureau may notify OEO. At that point, the various entities participating in the administrative remedy process can request that the decision to deny to reevaluated.

26. The DOJ makes the ultimate decision as to whether a modification request is granted or denied.

27. The BOP has implemented a process to obtain and review information from the inmates with SAM prior to the annual expiration of the SAM. Approximately three months before the SAM expire, the Bureau contacts the inmate to solicit comments and suggestions concerning a possible renewal or modifications to the SAM. The inmate is thus provided an opportunity to provide comments. Those comments are then routed to the ADX personnel who are in a position to provide input about the inmate.

28. This office also gathers information on the inmate's requests, grievances, and/or administrative remedies submitted by the inmate throughout the year; disciplinary information from throughout the year; correspondence to/from the inmate; telephone conversations of the inmate; types of educational materials requested; types of leisure materials requested; and participation in the various programming offered by the institution. The Warden then reviews the input from the inmate and staff and the information collected by us and determines whether to recommend renewal of the SAM,

and if renewal is recommended, what modifications to the inmate's SAM would be appropriate. The Warden prepares a written recommendation to the Assistant Director/General Counsel for the Bureau, through the Regional Director for the North Central Region. This information, including the inmate's written comments, may then be presented to the OEO for review and appropriate dissemination. True and correct copies of the documents reflecting this process for Plaintiff's most recent SAM renewal in March 2008 are attached to this Declaration as Exhibit A-13.

29. SAM inmates may have an appropriate need to contact a prospective attorney. In that event, a process is set up and authorization from the OEO is obtained, so that the inmate can contact an attorney of his choice via letter. If the attorney agrees to represent him, the attorney will review the SAM and acknowledge the requirement to abide by its restrictions by signing an affirmation.

30. H Unit inmates may check out books from the ADX library of approximately 900 volumes designated for H Unit.

31. Since approximately July 2008, on a daily basis SAMs inmates receive the previous day's edition of the *Denver Post*.

32. I have reviewed the Bureau documents attached as exhibits to this Declaration, and I hereby certify that they are true and correct copies of documents maintained in Bureau files.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on this 14th day of ~~December~~ January, 2009, at Florence, Colorado.

Christopher B. Synsvoll
Supervisory Attorney
Federal Correctional Complex
Florence, CO